UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CAMOFI MASTER LDC and CAMHZN MASTER
LDC,

                         Plaintiffs,

     -against-

RIPTIDE WORLDWIDE, INC. (f/k/a Shea
Development Corp.), BRAVERA, INC. (n/k/a as
RTWW Business Services, Inc.), IP HOLDINGS OF
NEVADA, INC., INFORMATION INTELLECT,
INC., FRANCIS E. WILDE, MATRIX
HOLDINGS, LLC, THOMAS E. WHEELER, E.
JOSEPH VITETTA, JR., and RICHARD
CONNELLY,

                       Defendants.

-------------------------------------------------------------X

10 Civ. _____ (_____)

10civ4020(CM) "ECF Case"

**COMPLAINT**

Plaintiffs CAMOFI Master LDC ("CAMOFI") and CAMHZN Master LDC ("CAMHZN") (together, "Plaintiffs"), by their undersigned attorneys Siller Wilk LLP, allege as follows:

## NATURE OF THE ACTION

1.     This action arises out of the unlawful and fraudulent acts of the defendants (collectively, "Defendants") in connection with and following their inducement to have Plaintiffs invest more than $7 million in Defendant Riptide Worldwide Inc., f/k/a Shea Development Corp. ("RTWW").

2.     Specifically, in July 2007, Plaintiffs agreed to lend RTWW approximately $7.25 million in the aggregate (the "Loan") in exchange for certain senior secured notes due March 13, 2010 (the "Notes"), shares of common stock of RTWW, par value $0.0001 per share (the "Issued Shares"), and warrants to purchase shares of RTWW's common stock, par value $0.0001 per

share (the "Warrants").  Under the terms of the Notes, RTWW agreed to make monthly interest and principal payments to Plaintiffs.

3.    Certain of the terms relating to the Loan are set forth in the Securities Purchase Agreement, dated as of July 13, 2007, among Plaintiffs and RTWW (the "SPA").  As set forth in Section 4.9 of the SPA, the proceeds of the Loan were to be used by RTWW exclusively for consummation of its acquisition of two corporations, Riptide Software, Inc. ("Riptide Software"), and Defendant Bravera, Inc. (n/k/a RTWW Business Services, Inc.) ("Bravera"), both of which were to become wholly-owned subsidiaries of RTWW.

4.    As set forth below, in their effort to induce Plaintiffs to extend the Loan and to enter into the SPA and related transaction documents (collectively, and including the SPA, the "Transaction Documents"), Defendants made numerous false and misleading statements and representations concerning the financial condition and prospects of RTWW and its subsidiaries (collectively, the "RTWW Subsidiaries"), including Riptide Software and Defendant Bravera, both in direct communications with Plaintiffs and their representatives and in the Transaction Documents themselves.

5.    Defendants made further false and misleading statements to Plaintiffs when, following repeated defaults by RTWW and the RTWW Subsidiaries under the Transaction Documents, Defendants intended to induce Plaintiffs not to pursue remedies available to them and instead to enter into a limited waiver agreement concerning the past defaults.

6.    Defendants also made false and misleading statements concerning the financial condition of RTWW and the RTWW Subsidiaries in public filings with the Securities and Exchange Commission (the "SEC").

7.    Moreover, the individual Defendants, all current or former directors and/or senior officers of RTWW and/or the RTWW Subsidiaries named as Defendants herein, engaged in a

2

pattern of conduct that diminished the value of the collateral securing the Notes, including all of the property and assets of RTWW and the RTWW Subsidiaries (the "Collateral"), through, among other things, payment of improper and unlawful "bonuses" and increased salaries to themselves and related parties and payment of alleged obligations to third parties.

8.     Plaintiffs would not have entered into the SPA, nor would they have loaned approximately $7.25 million to RTWW, had they known that the representations and statements made by Defendants concerning the financial condition of RTWW and the RTWW Subsidiaries were untrue.

9.     Plaintiffs would not have delayed in exercising their right of acceleration of the Notes and foreclosure on the Collateral or granted RTWW and the RTWW Subsidiaries a limited waiver of defaults under the Transaction Documents, had Plaintiffs known that the representations and warranties made by Defendants concerning the financial condition and prospects of RTWW and the RTWW Subsidiaries or the timing of repayment of the Loan, both before and subsequent to execution of the Transaction Documents, were untrue.

10.     As a direct result of Defendants' breaches of the relevant agreements, misrepresentations, and other wrongdoing, Plaintiffs have suffered severe losses of interest and principal on the Notes.

## THE PARTIES

11.     Plaintiff CAMOFI is a Cayman Islands Limited Duration Company having its principal place of business in the Cayman Islands.

12.     Plaintiff CAMHZN is a Cayman Islands Limited Duration Company having its principal place of business in the Cayman Islands.

13.     Defendant RTWW is a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 200 East Palm Valley Drive, Oviedo,

389629

Florida 32765. RTWW's stock trades on the Pink Sheets under the symbol "RTWW." RTWW changed its name from Shea Development Corp. to Riptide Worldwide, Inc., effective January 2, 2008.

14.     Defendant Bravera is a wholly-owned subsidiary of Defendant RTWW and, upon information and belief, is a corporation organized and existing under the laws of the State of Florida, having its principal place of business at 200 East Palm Valley Drive, Oviedo, Florida 32765.

15.     Defendant Information Intellect, Inc. ("Information Intellect"), is a wholly-owned subsidiary of Defendant RTWW and, upon information and belief, is a corporation organized and existing under the laws of the State of Georgia, having its principal place of business at 200 East Palm Valley Drive, Oviedo, Florida 32765.

16.     Defendant IP Holdings of Nevada, Inc. ("IP Holdings"), is a wholly-owned subsidiary of Defendant RTWW and, upon information and belief, is a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 200 East Palm Valley Drive, Oviedo, Florida 32765.

17.     Defendant Francis E. Wilde is the Executive Chairman of the Board of Directors and Chief Executive Officer of Defendant RTWW. Mr. Wilde was the principal officer and executive of RTWW who negotiated and met with Plaintiffs before and after execution of the Transaction Documents and extension of the Loan to RTWW. Some of these meetings occurred in New York, New York. Upon information and belief, Mr. Wilde resides in Richardson, Texas.

18.     Upon information and belief, Defendant Matrix Holdings, LLC ("Matrix") is a corporation wholly-owned and controlled by Defendant Wilde. Matrix is the owner of a Convertible Subordinated Note, dated November 21, 2008, in the amount of $1.565 million issued by RTWW (the "Matrix Note"), a copy of which was attached to a Form 8-K filed by

389629

RTWW with the SEC on November 25, 2008.  According to the Matrix Note, Matrix is located at 1359 Broadway, Suite 600, New York, New York 10018.

19.     Defendant Thomas E. Wheeler is the Vice Chairman of the Board of Directors and Executive Vice President of Mergers and Acquisitions of Defendant RTWW.  Mr. Wheeler was the President of RTWW at the time Plaintiffs first engaged in conversations with RTWW concerning the Loan and he actively participated on behalf of RTWW in the due diligence conducted by Plaintiffs prior to extension of the Loan to RTWW.  Upon information and belief, Mr. Wheeler resides in Marietta, Georgia.

20.     Defendant E. Joseph Vitetta is the Executive Vice President and Corporate Secretary of Defendant RTWW.  Mr. Vitetta was the Senior Vice President and Corporate Secretary of RTWW at the time Plaintiffs first engaged in conversations with RTWW concerning the Loan and he actively participated on behalf of RTWW in the due diligence conducted by Plaintiffs prior to extension of the Loan to RTWW.  Upon information and belief, Mr. Vitetta resides in Alpharetta, Georgia.

21.     Defendant Richard Connelly is the former Chief Financial Officer ("CFO") of Defendant RTWW.  Mr. Connelly was the CFO of RTWW at the time Plaintiffs first engaged in conversations with RTWW concerning the Loan and he actively participated on behalf of RTWW in the due diligence conducted by Plaintiffs prior to extension of the Loan to RTWW.  Upon information and belief, Mr. Connelly resigned from RTWW as of June 30, 2008, but was continued to be paid a salary for three months for consulting services allegedly provided to RTWW.  Upon information and belief, Mr. Connelly resides in Fairview, Texas.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C §1331, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78aa,

because the claims asserted herein arise in part under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78(j)(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

23.     Venue is proper in this Court because each of the Transaction Documents contains a New York choice of law provision and a venue provision, which provides for resolution of any disputes in any federal or state court sitting in the State of New York, Borough of Manhattan.

24.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTUAL BACKGROUND

### A.     Background to the SPA

25.     Defendant RTWW was incorporated in February 2005 as Shea Development Corp. In the beginning of 2007, RTWW determined to expand its products and transition its business into a global information technology ("IT") and business process management ("BPM") company.

26.     To that end, in March 2007, RTWW acquired Defendant Information Intellect in a reverse merger transaction, whereupon Information Intellect became a wholly-owned subsidiary of RTWW.   Information Intellect develops, markets, and licenses a line of enterprise asset management software solutions.

27.     Next, RTWW entered into agreements in April 2007 for the purchase of Riptide Software and Defendant Bravera.  Riptide Software provides custom programming services to build configurable enterprise software solutions for revenue and financial management systems, enterprise application integration, user-interface frameworks, middle-tier frameworks, military and commercial modeling and simulation, and military command, control, and communication

389629

centers. As set forth further below, following a default notice sent by Plaintiffs to Defendants, Plaintiffs foreclosed on Riptide Software, which by then was the sole remaining asset of value of RTWW.

28.     Defendant Bravera produces on-demand software solutions for BPMs. Bravera provides electronic content management and business process automation to a wide range of clients in the commercial and government sectors.

29.     In order to finance the acquisition of Riptide Software and Defendant Bravera, RTWW determined to recruit investors. As such, RTWW entered into discussions with Plaintiffs in or about the Spring of 2007 concerning Plaintiffs' possible investment in RTWW.

30.     In the weeks leading up to the execution of the SPA, numerous calls and in-person meetings in New York took place between Plaintiffs and officers and executives of RTWW including, in particular, Defendant Wilde, during which RTWW made numerous representations concerning the financial condition and prospects of RTWW and the RTWW Subsidiaries.

**B.     The Transaction Documents**

**The Securities Purchase Agreement**

31.     Plaintiffs CAMOFI and CAMHZN, on the one hand, and RTWW, on the other, entered into the SPA, dated as of July 13, 2007, for the purchase and sale of the Notes, the Issued Shares, and the Warrants. A copy of the SPA is attached to this Complaint in the form of   A.

32.     Under the terms of the SPA and related Transaction Documents, on or about July 13, 2007, Plaintiffs loaned RTWW approximately $7.25 million, the proceeds of which were to be used by RTWW solely for the purpose of consummating RTWW's acquisitions of Riptide Software and Defendant Bravera.

389629

33.     Pursuant to Section 5.9 of the SPA, the SPA is governed by New York law and all disputes thereunder are to be brought "exclusively in the state and federal courts sitting in the City of New York."

34.     Section 5.9 of the SPA further provides that the prevailing party in any action brought to enforce the provisions of the Transaction Documents is entitled to payment of its attorneys' fees and other costs and expenses "incurred with the investigation, preparation and prosecution of such action or proceeding."

### The Notes and Warrants

35.     Each of the Notes is dated July 13, 2007, and was due on or before March 13, 2010. The Notes are secured by a first priority lien on the Collateral, which comprises all of the property and assets of RTWW and the RTWW Subsidiaries (with the exception of Riptide Software, which, as set forth below, is now owned by Plaintiffs CAMOFI and CAMHZN following a foreclosure proceeding by Plaintiffs on or about October 19, 2009). Copies of the Notes are attached to this Complaint in the form of Exhibits B and C, respectively. Copies of the Warrants are attached to this Complaint in the form of Exhibits D and E, respectively.

36.     Pursuant to Section 2(a) of the Notes, RTWW agreed to pay interest to Plaintiffs on the outstanding principal amount of the Notes quarterly in arrears commencing on October 1, 2007, and, pursuant to Section 6(a) of the Notes, RTWW agreed to make monthly interest and principal payments to each Plaintiff on the first business day of each month, beginning January 1, 2008.

37.     In addition, among other restrictions, the Notes: (i) prohibit RTWW from the issuance of any debt other than the debt issued in connection with the acquisitions of Riptide Software and Defendant Bravera; (ii) limit RTWW's repurchase of any equity securities outstanding; (iii) limit RTWW's investment in or acquisitions of securities of another person or

8

389629

third-party entity; and (iv) restrict RTWW's payment of dividends, payments for capital expenditures, and payment of other debts subordinate to the Notes.

38.     Section 9(b) of the Notes provides that "[i]f any Event of Default [as such term is defined in the Notes] occurs, the full principal amount of this Note, together with interest and other amounts owing in respect thereof, to the date of acceleration shall become, at the Holder's election, immediately due and payable in cash.   The aggregate amount payable upon an Event of Default shall be equal to the Mandatory Prepayment Amount."   The Notes define the "Mandatory Prepayment Amount" as equal to "the sum of (i) 125% of the principal amount of Notes to be prepaid, plus all accrued and unpaid interest thereon, and (ii) all other amounts, costs, expenses and liquidated damages due in respect of such Notes."

39.     Section 2(d) of each Note provides that all overdue accrued and unpaid interest to be paid under the Notes shall "entail a late fee at the rate of 18% per annum (or such lower maximum amount of interest permitted to be charged under applicable law) ("Late Fee"), which will accrue daily, from the date such interest is due hereunder through and including the date of payment."   In addition, Section 9(b) of each Note provides that "[c]ommencing 5 days after the occurrence of any Event of Default that results in the eventual acceleration of this Note, the interest rate on this Note shall accrue at the rate of 18% per annum, or such lower maximum amount of interest permitted to be charged under applicable law."

40.     In accordance with Section 9(b) of each Note, RTWW expressly waived any right to notice or grace period before Plaintiffs exercised their rights upon the occurrence of an Event of Default thereunder.

41.     Pursuant to Section 10(e) of each of the Notes, the Notes are governed by New York law, and all disputes thereunder are to be brought exclusively in the state and federal courts of New York, Borough of Manhattan.

389629

42.     Section 10(e) of each Note further provides that the prevailing party in any action brought to enforce the provisions of the Transaction Documents is entitled to payment for its attorneys' fees and "other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding."

43.     Pursuant to Section 5(f) of the Warrants, all questions concerning the "construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the [SPA]."

<u>**The Subsidiary Guarantee**</u>

44.     In order to induce Plaintiffs to extend the Loan to RTWW, on or about July 13, 2007, each of the RTWW Subsidiaries entered into a "Subsidiary Guarantee" whereby each of them "jointly and severally, unconditionally and irrevocably" guaranteed to Plaintiffs "the prompt and complete payment and performance by [RTWW] when due (whether at the stated maturity, by acceleration or otherwise)" of "all obligations and undertakings of [RTWW] of whatever nature, monetary or otherwise, under the Note, the [SPA], the Security Agreement, the Security Interest and Pledge Agreement, the Warrants, the Registration Rights Agreement or any other future agreement or obligations undertaken by [RTWW] to [Plaintiffs], together with all reasonable attorneys' fees, disbursements and all other costs and expenses of collection incurred by [Plaintiffs] in enforcing any of [RTWW]'s obligations under [such agreements] and/or this Guarantee."  A copy of the Subsidiary Guarantee is attached to this Complaint in the form of Exhibit F.

45.     Pursuant to Section 3(e) of the Subsidiary Guarantee, the representations and warranties of RTWW set forth in the SPA, which are incorporated into the Subsidiary Guarantee by reference, "are true and correct as of each time such representations are deemed to be made pursuant to such [SPA], and [Plaintiffs] shall be entitled to rely on each of them as if they were

fully set forth herein, provided that each reference in each such representation and warranty to the Company's knowledge shall, for purposes of this Section 3, be deemed a reference to such Guarantor's knowledge."

46.     Moreover, in Section 5(n) of the Subsidiary Guarantee, RTWW covenanted that it would cause any subsidiaries it formed or acquired subsequent to execution of the Transaction Documents and extension of the Loan "to become a Guarantor for all purposes of this Guarantee by executing and delivering an Assumption Agreement in the form of Annex 1 hereto."

47.     Pursuant to Section 5(k) of the Subsidiary Guarantee, it "is to be governed by, and construed and interpreted in accordance with, the law of the State of New York without regard to any principles of conflicts of laws."

48.     Pursuant to Section 5(l) of the Subsidiary Guarantee, each Guarantor irrevocably and unconditionally: (i) "submits for itself and its property in any legal proceeding relating to this Guarantee and the other Transaction Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction" of the courts of the state and federal courts of New York, located in New York County, New York, and any related appellate courts; (ii) waives any objection to venue as to these courts; and (iii) irrevocably waives personal service of process and consents to process by registered or certified mail.

### The Security Agreement

49.     To further induce Plaintiffs to extend the Loan to RTWW, RTWW and the RTWW Subsidiaries entered into a Security Agreement, dated as of July 13, 2007 (the "Security Agreement"), granting Plaintiffs "a continuing and perfected security interest in and to, a lien upon and a right of set-off against all their respective right, title and interest of whatsoever in

11

kind and nature in and to" the Collateral (as such term is defined in the Security Agreement).  A copy of the Security Agreement is attached to this Complaint in the form of Exhibit G.

50.     The purpose of the Security Agreement is "to secure the complete and timely payment, performance and discharge in full, as the case may be, when due of" RTWW's and the RTWW Subsidiaries' "Obligations" (as such term is defined in the Security Agreement).

51.     "Events of Default" under the Security Agreement include, among other things, the occurrence of an Event of Default under the Notes, or if any representation or warranty of [RTWW or the RTWW Subsidiaries] in the Security Agreement "shall prove to have been incorrect in any material respect when made."

52.     Pursuant to the Security Agreement, should an Event of Default occur, Plaintiffs have the right to exercise all the remedies available to them in the Security Agreement itself and under the Notes.  Such rights include, among other things, the right to take possession of the Collateral and to operate the business of RTWW and the RTWW Subsidiaries using the Collateral foreclosed on by Plaintiffs.

53.     Plaintiffs perfected the security interest granted under the Security Agreement.

54.     Pursuant to Section 19(h) of the Security Agreement, the Security Agreement is governed by New York law and all disputes thereunder are to be brought exclusively in the state and federal courts of the City of New York, Borough of Manhattan.

### The Registration Rights Agreement

55.     The parties also entered into a "Registration Rights Agreement" (the "RRA"), dated as of July 13, 2007, in connection with the Issued Shares and Warrants.  Pursuant to the RRA, RTWW was required to file an initial registration statement within the 30th calendar day after July 13, 2007.  A copy of the RRA is attached to this Complaint in the form of Exhibit H.

389629

56.     Pursuant to Section 6(k) of the RRA, "[a]ll questions concerning the construction, validity, enforcement, and interpretation of [the RRA] shall be determined with the provisions of the [SPA]."

### C.    Misrepresentations to Plaintiffs Concerning the Financial Condition of RTWW and the RTWW Subsidiaries

57.     As part of their due diligence process for the Loan, Plaintiffs relied on: (i) the financial information provided to them by RTWW, the RTWW Subsidiaries, and their respective officers and employees including, in particular, Defendants Wilde, Wheeler, Vitetta, and Connelly; (ii) representations and warranties made by Defendants directly to Plaintiffs; and (iii) representations in the Transaction Documents themselves.

58.     As set forth below, many of the representations and warranties made by Defendants to Plaintiffs concerning the financial condition, assets, and prospects of RTWW and the RTWW Subsidiaries were false at the time made and known to be so by Defendants.

59.     For example, in Section 3.1(aa) of the SPA, entitled "Solvency," Defendants represent that, after receipt of the Loan and proper application of its proceeds, the "fair saleable value of the assets of [RTWW and the RTWW Subsidiaries, as a whole] exceeds the amount that will be required to be paid on or in respect of [their] existing debts and other liabilities (including known contingent liabilities) as they mature."

60.     This representation was false because Defendants knew or should have known that the value of the assets of RTWW and the RTWW Subsidiaries -- i.e., the value of the Collateral -- on the date of execution of the SPA was far less than $7.25 million, the amount of the Loan. Defendants knew this representation was false because, as they were aware, RTWW failed to perform two of the critical Closing Conditions set forth in Section 2.3 of the SPA, namely that: (a) RTWW's "pro-forma balance shall contain at least $3.5 million, in cash," and

13

389629

(ii) "at least $4 million of additional equity shall have been contributed to [RTWW] on terms satisfactory to [Plaintiffs]."

61.     Defendants also misrepresented and/or failed to disclose to Plaintiffs that certain "guaranteed" contracts entered into between the RTWW Subsidiaries and third parties for the purchase of the RTWW Subsidiaries' IT and BPM products did not represent a fixed and determinable stream of income that could secure repayment of the Notes.

62.     Another significant misrepresentation made by Defendants to Plaintiffs concerned payment of Riptide Software's outstanding tax liability as of the date of execution of the Transaction Documents.   Specifically, pursuant to the Agreement and Plan of Merger between RTWW and Riptide Software, dated as of April 4, 2007, RTWW agreed that, following the closing of that transaction, RTWW would cause Riptide Software to make payment to the Internal Revenue Service ("IRS") of up to $830,000 of Riptide Software's then- outstanding tax liability.   The Agreement provides that Riptide Software would be reimbursed for this payment by Riptide Software's former shareholders in three annual installment payments from funds received by them upon payment of notes issued by RTWW in connection with the merger of Riptide Software into RTWW.

63.     Defendants represented to Plaintiffs that they would cause Riptide Software to make the agreed payments to the IRS on time and Plaintiffs relied on this representation in connection with their evaluation of the financial condition of RTWW and the RTWW Subsidiaries prior to extension of the Loan. Defendants knew or should have known, however, that such representation was false because, at the time of execution of the Transaction Documents, RTWW lacked the resources to make payment on the notes issued to Riptide Software's former shareholders and Riptide Software lacked the resources to make the agreed payment of up to $830,000 to the IRS in connection with the company's pre-existing tax

14

389629

liability.  Riptide Software's tax liability ultimately grew to approximately $2 million, greatly reducing its value.

64.     Indeed, upon information and belief, Riptide Software has lost significant government contracts because of its failure to pay its due and owing taxes, greatly reducing the value of Riptide Software and the Collateral securing the Notes.

**D.     Failure to Make Payments Due and Payable Under the Notes**

65.     RTWW breached its obligations of payment under the Notes almost immediately subsequent to execution of the Transaction Documents by failing to make any and all required principal and interest payments when due and payable as required by the Notes.

66.     As set forth below, in response to inquiries by Plaintiffs concerning payment, RTWW repeatedly assured and represented to Plaintiffs that payment was imminent.

67.     For example, on January 24, 2008, Plaintiffs sent an e-mail with an attached invoice to Defendant Connelly, then the CFO of RTWW, for interest and principal which had been due under the Notes on December 31, 2007, but not paid.  When they did not receive a reply, on February 19, 2008, Plaintiffs sent a follow-up notice to Defendant Connelly.

68.     Defendant Connelly responded by e-mail on February 19, 2008, advising Plaintiffs that payment would be made following completion of funding RTWW was then seeking to secure.  When reminded by Plaintiffs that such a delay was a breach of RTWW's obligations under the Notes, Defendant Connolly referred Plaintiffs to Defendant Wilde.

69.     By e-mail dated March 2, 2008, Defendant Wilde advised Plaintiffs that (i) RTWW is "receiving money into the company this week to catch up payments I hoped we could make last Friday," and (ii) RTWW is "also in a position to close the sale of the Metermesh unit" and "[t]he majority of the proceeds of this transaction will be paid to [Plaintiffs] Monday or

15

Tuesday, depending on when they hit our account." Nonetheless, no payments were sent to Plaintiffs.

70.    Similarly, on March 31, 2008, in response to an inquiry from Plaintiffs concerning the funds owed by RTWW, Defendant Wilde sent an e-mail to Plaintiffs advising them that a transaction would be closing that week and RTWW would be in a position to make a payment to Plaintiffs by the end of the week. Once again, no payments were made to Plaintiffs.

71.    To date, the only payment received by Plaintiffs under the Notes were two checks dated October 30, 2008, in the aggregate amount of $750,000, from Defendant Matrix, a corporation which, upon information and belief, is wholly-owned and controlled by Defendant Wilde and whose address just happens to be the same as that of RTWW's and Mr. Wilde's outside legal counsel. This payment followed a Notice of Intent to Foreclose, dated October 24, 2008, sent by Plaintiffs' Counsel to Defendant RTWW.

**E.    The Limited Waiver Agreement and Breach Thereof**

72.    In reliance on Defendants' repeated representations concerning imminent payment, on or about April 18, 2008, Plaintiffs entered into a limited waiver agreement with RTWW concerning the defaults in payment as of that date (the "Waiver Agreement"). A copy of the Waiver Agreement is attached to this Complaint in the form of Exhibit I.

73.    Pursuant to Section 2 of the Waiver Agreement, "upon any breach of this Agreement by [RTWW], such breach shall reinstate the Event of Default under the applicable Transaction Document being waived hereby, whereupon [Plaintiffs] shall have the right to immediately pursue any remedy which may be available to [them] under any applicable Transaction Document, including without limitation [their] right to enforce payment of all of the Obligations and, in connection therewith, without further notice, to enforce its liens on, and security interest in, the Collateral."

16

389629

74.   Section 16 of the Waiver Agreement provides that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to agreements to be delivered and wholly performed within said State."

75.   In consideration for Plaintiffs' agreement to a limited waiver of their then-existing rights to enforce payments for defaults under the Transaction Documents, pursuant to the Waiver Agreement, RTWW agreed, among other things to: (i) wire $1.6 million to Plaintiff CAMOFI and $400,000 to Plaintiff CAMHZN on or before April 25, 2008; (ii) issue warrants to Plaintiffs to purchase specified amounts of shares of RTWW's common stock; and (iii) pay to Plaintiffs all outstanding amounts under the Notes no later than June 30, 2008, by making certain specified payments to Plaintiffs on or before each of May 15, June 15, and June 30, 2008.

76.   Pursuant to Section 8 of the Waiver Agreement, all of the terms and conditions of all of the Transaction Documents, other than the dates of payments to Plaintiffs under the Notes, continued in full force and effect after execution of the Waiver Agreement.

77.   On April 24, 2008, RTWW filed a Form 8-K with the SEC concerning its obligations under the Waiver Agreement.  In the Form 8-K, RTWW set forth the schedule and amount of payments agreed to be made to Plaintiffs and represented that "[a]fter making the payments above, the Company expects that on or before June 30, 2008, the obligations [to Plaintiffs] under the Senior Notes including accrued interest and any default penalties will have been settled in full."

78.   RTWW further represented in the April 24, 2008 Form 8-K as follows:

> The Company expects to have sufficient funds available to make these payments from the issuance of Series C Preferred Stock pursuant to a Series C Preferred Stock Purchase Agreement with Matrix Holdings, LLC ("Matrix"), an entity owned and controlled by Frank Wilde, Riptide's CEO. Matrix has agreed to invest up to $15 million in cash in return for shares of Convertible Redeemable Series C Preferred Stock, par value $0.001 per share, ("Series C Shares") and warrants to

17

389629

purchase shares of the Common Stock at a rate of one warrant for every two Series C Shares purchased. The Company expects Matrix to make the investment of up to $15 million in multiple tranches. Riptide plans to use the proceeds from the sale of the Series C Shares to repay debt, make acquisitions and for working capital purposes.

79.   RTWW immediately breached the Waiver Agreement by failing to make even the first payment due thereunder and by failing to issue to Plaintiffs the agreed-upon warrants to purchase shares of RTWW common stock.

80.   RTWW acknowledged its failure to make payments under the Waiver Agreement in a Form 10-Q filed with the SEC on or about May 15, 2008, which provides as follows:

As of May 12, 2008, no payments have been made pursuant to the [Waiver] Agreement. The Company expects that the cash to make the payments under this agreement will come from the cash proceeds received from the future issuance of Series C Shares to the Related Party and/or other investors, however no assurances can be made that we will raise the cash necessary to make these payments or that the defaults will be waived as expected.

81.   The "Related Party" referred to in the above quote is Defendant Matrix, which, as set forth above, upon information and belief, is a corporation wholly-owned and controlled by Defendant Wilde.

82.   Upon information and belief, Defendants knew, or should have known, that the payments promised would not, and in fact, could not, be made because Defendants did not have the resources available to make such payments, and had no real or legitimate expectation of acquiring such funds.

83.   Thus, rather than make payments due under the Waiver Agreement, the Defendants again began to make empty promises of imminent transaction closings and payment to Plaintiffs, all designed to induce Plaintiffs not to exercise their rights of foreclosure under the Transaction Documents and Waiver Agreement.

389629

84.     For example, by e-mail dated May 15, 2008, Defendant Wilde advised Plaintiffs in writing that "[o]ur bank completed all processing of our deal and will transfer the money to us late Thursday or early Friday" and "as the money starts coming in I will just start doing wire transfers to [Plaintiffs] and get all this finalized as quickly as possible.  This will start today or tomorrow."

85.     Similarly, by e-mail dated August 20, 2008, Defendant Vitetta advised an independent consultant retained by Plaintiffs that "money will be available to make a payment to [Plaintiffs] on Monday."

86.     On September 2, 2008, Defendant Wilde sent an e-mail, among others, to RTWW's counsel and Defendants Wheeler and Vitetta, copying Plaintiffs' counsel, stating that "[t]he bank has confirmed that they have sent the funds to the Matrix account in Morgan Stanley and that they will arrive tomorrow."  Upon information and belief, the Matrix account referred to by Defendant Wilde is an account personally owned by him and/or under his sole control.

87.     In his email of September 2, 2008, Defendant Wilde further represents that $8.5 million would be sent to Plaintiffs within the next two days and he promises that additional RTWW debt would be paid at the same time, including (i) $1.5 million "Riptide payments," and (ii) $1.25 million to RTWW's outside counsel, which firm includes Defendant Wilde's brother-in-law as a partner.  Three days later, on September 5, 2008, an RTWW employee forwarded to Plaintiffs an internal e-mail from Defendant Wilde stating that he had just spoken to the relevant bank "and they have confirmed deposit of the first tranche of money – [$]20M[illion]."

88.     Plaintiffs received no payments from any deposit of funds into Defendant Wilde's Morgan Stanley account in the name of Defendant Wilde, or otherwise.

89.     False statements of supposed funds received by RTWW and which would be immediately sent to Plaintiffs to cover all payments due and owing under the Notes continued

19

thereafter.  For example, by e-mail dated September 11, 2008, Defendant Wilde advised counsel for Plaintiff that "we have now confirmed that Morgan Stanley has the deposits I mentioned.  I will be at their office at 8am in the morning to insure that the money gets released for delivery to you ASAP."

90.     On September 30, 2008, Defendant Wilde advised counsel for Plaintiffs by e-mail that RTWW had received certain financing and that RTWW would make the following payments to Plaintiffs by wire: (i) $2.5 million on October 1, 2008; (ii) $2.5 million on October 7, 2008; and (iii) $5 million on October 10, 2008.  No such payments were ever made.

91.     Defendants also continued to misrepresent to Plaintiffs facts concerning supposed lucrative contracts entered into by RTWW and/or the RTWW Subsidiaries with third parties.  For example, by e-mail dated October 21, 2008, Defendant Wilde advised Plaintiffs that RTWW had "3 very strong opportunities completed that expect to deliver funds to us on Thursday."  On October 31, 2008, Defendant Wilde advised Plaintiffs by e-mail that RTWW had just closed two deals with customers and that payment would be imminent.

92.     By e-mail dated November 10, 2008, Defendant Wilde advised Plaintiffs that "Friday was a blockbuster day for us.  We have 9 opportunities that are in various stages of closing today."

93.     Upon information and belief, none of these supposed deals were real, as Defendant Wilde well-knew.

94.     As set forth above, to date, the only payment received by Plaintiffs under the Notes were two checks dated October 30, 2008, in the aggregate amount of $750,000, both from Defendant Matrix.  This payment followed an October 24, 2008 Notice of Intent to Foreclose sent by Plaintiffs' Counsel to Defendant RTWW.

20

95.    Such payments were made by Defendant Matrix in furtherance of Defendants'
plan to induce Plaintiffs not to exercise their rights of foreclosure under the Transaction
Documents and Waiver Agreement.

**F.    Notices of Default and Foreclosure of Riptide Software**

96.    On February 18, 2009, Plaintiffs sent a second Notice of Intent to Foreclose to
Defendant Wilde (the "Notice of Intent").  A copy of the Notice of Intent is attached to this
Complaint in the form of Exhibit J.

97.    As set forth in the Notice of Intent, as of that date, RTWW was indebted to
Plaintiffs CAMOFI and CAMHZN in the amounts of $11,062,809.55 and $2,556,367.45,
respectively.

98.    In the Notice of Intent, Plaintiffs advised Defendants that, in the event Plaintiffs
CAMOFI and CAMHZN did not receive at least $2,000,000 and $500,000, respectively, by close
of business on February 20, 2009, Plaintiffs intended to foreclose on the Collateral.

99.    Following receipt of the Notice of Intent, Defendant Wilde again made repeated
assurances to Plaintiffs that the payments demanded in the Notice of Intent would be paid
imminently.  The statements made by Defendant Wilde were knowingly false and were intended
to and did induce Plaintiffs not to foreclose immediately.

100.    For example, on April 29, 2009, Defendant Wilde represented in writing to
Plaintiffs that RTWW had just closed a deal and would be paid $5 million that week.  Defendant
Wilde asked Plaintiffs to "hang on" because payments "will come very soon."   Five days later,
on May 4, 2009, Defendant Wilde advised Plaintiffs that RTWW was "contacted today to
confirm that the money will be in our account Tuesday morning."   According to Defendant
Wilde, after receipt of such funds by RTWW, "the process will work the same way for the next
40 weeks . . . they will send us money on Friday and we will receive it on Tuesday and Matrix

21

will turn the money around to you the same day from the Dunnington Escrow until everything is paid!"

101.    Once again, no payments were made to Plaintiffs.  Accordingly, on May 12, 2009, Plaintiffs' counsel sent a letter to RTWW's Board of Directors advising the Board of Plaintiffs' intention to commence foreclosure proceedings against RTWW's assets (the "Foreclosure Notice").  Plaintiffs requested the cooperation of the Board in an effort to preserve the assets and resources of RTWW and the RTWW Subsidiaries.  Plaintiffs received no response to this Foreclosure Notice.

102.    On or about September 25, 2009, Plaintiffs notified RTWW's creditors that it was conducting a private sale of Riptide Software.

**G.    Fraudulent Conveyances**

103.    As set forth above, Defendants made numerous materially false statements concerning imminent payments to Plaintiffs in order to cause Plaintiffs, among other things, not to (i) exercise their rights under the SPA and other Transaction Documents, and (ii) immediately accelerate payment under the Notes.

104.    In reliance on these representations, Plaintiffs did not accelerate the Loan or foreclose on the Collateral until September 2009.  As a consequence, Defendants were able to use the Collateral for their own benefit, thereby significantly impairing Plaintiffs' rights and the value of the Collateral.

105.    For example, upon information and belief, Defendants Wilde, Wheeler, Vitetta and Connolly made undeserved bonus payments to themselves in the amount of $40,000 each. The bonuses were ostensibly based on Defendants' success in causing RTWW and the RTWW Subsidiaries to exceed projected pre-tax earnings for 2008.  These Defendants also increased

389629

their own salaries for the same supposed reason. In fact, such claimed financial success was false.

106. In addition, upon information and belief, Defendants made payments in excess of amounts earned by the law firm of Dunnington, Bartholow & Miller LLP in Manhattan, New York, a firm which includes as a partner the brother-in-law of Defendant Wilde.

## FIRST COUNT
### (Breach of Securities Purchase Agreement – Against RTWW)

107. Plaintiffs reallege every allegation in paragraphs 1 through 106, above.

108. Plaintiffs fully performed all of their obligations to RTWW under the SPA.

109. By contrast, as set forth above, Defendant RTWW breached the SPA by violating various covenants and by making false representations and warranties concerning the financial condition, assets, and prospects of RTWW and the RTWW Subsidiaries.

110. As set forth above, these representations and warranties were false.

111. As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $15 million to Plaintiff CAMOFI and $4 million to Plaintiff CAMHZN.

112. Accordingly, RTWW is liable to Plaintiffs for breach of the SPA.

## SECOND COUNT
### (Breach of the Notes – Against RTWW)

113. Plaintiffs reallege every allegation in paragraphs 1 through 106 and 108 through 112, above.

114. As set forth above, RTWW defaulted under the Notes by failing to pay principal and interest payments to Plaintiffs when due and payable. RTWW has acknowledged these defaults in its publicly filed SEC documents and in direct communications with Plaintiffs. Accordingly, such defaults are not in dispute.

389629

115.    RTWW's failure to timely pay Plaintiffs the required payments under the Notes as and when due constitutes Events of Default thereunder, thereby entitling Plaintiffs to accelerate the Notes and to recover from RTWW the Mandatory Prepayment Amount as set forth therein.

116.    As of May 12, 2010, RTWW owed Plaintiffs a Mandatory Redemption Amount under the Notes in an amount of at least $1.6, collectively.  In addition, RTWW is obligated to pay interest, costs, and attorney's fees in accordance with the terms of the Notes in an amount to be determined at trial.

117.    Plaintiffs have no obligations to RTWW under the Notes.

118.    Accordingly, RTWW is liable to Plaintiffs for breach of the Notes.

### THIRD COUNT
### (Breach of Subsidiary Guarantee – Against Bravera, Information Intellect, and IP Holdings)

119.    Plaintiffs reallege every allegation contained in paragraphs 1 through 106, 108 through 112, and 114 through 118, above.

120.    As set forth above, each of the RTWW Subsidiaries, including Bravera, Information Intellect, and IP Holdings, "jointly and severally, unconditionally and irrevocably" guaranteed to Plaintiffs "all obligations and undertakings of [RTWW] of whatever nature, monetary or otherwise" under the Notes, the SPA, the Security Agreement, the Warrants, and the Registration Rights Agreement, and "any other future agreement or obligations undertaken" by RTWW to Plaintiffs, together with all reasonable attorneys' fees, disbursements, and all other costs and expenses of collection incurred by Plaintiffs in enforcing any of RTWW's obligations under the Subsidiary Guarantee.

121.    Plaintiffs have no obligations to Bravera, Information Intellect, and IP Holdings under the Subsidiary Guarantee.

389629

122.   To date, not one of Defendants Bravera, Information Intellect, and IP Holdings has satisfied its obligations to Plaintiffs.

123.   As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

124.   Accordingly, each of Defendants Bravera, Information Intellect, and IP Holdings is liable to Plaintiffs under the Subsidiary Guarantee.

**FOURTH COUNT**
**(Breach of Security Agreement –Against RTWW,**
**Bravera, Information Intellect, and IP Holdings)**

125.   Plaintiffs reallege every allegation contained in paragraphs 1 through 106, 108 through 112, 114 through 118, and 120 through 124, above.

126.   As set forth above, each of Defendants RTWW, Bravera, Information Intellect, and IP Holdings, "jointly and severally, unconditionally and irrevocably" guaranteed to Plaintiffs "all obligations and undertakings of [RTWW] of whatever nature, monetary or otherwise," under the Notes, the SPA, the Security Agreement, the Warrants, and the Registration Rights Agreement, and "any other future agreement or obligations undertaken" by RTWW to Plaintiffs, together with all reasonable attorneys' fees, disbursements and all other costs and expenses of collection incurred by Plaintiffs in enforcing any of RTWW's obligations under the Security Agreement.

127.   As further set forth above, RTWW, Bravera, Information Intellect, and IP Holdings breached the Security Agreement by virtue of the Events of Default that have arisen under the Notes as set forth above, including failures to make principal and interest payments when due and owing.  In addition, RTWW is obligated to pay interest, costs, and attorney's fees in accordance with the terms of the Notes in an amount to be determined at trial.

389629

128.   As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

129.   Plaintiffs have no obligations to RTWW, Bravera, Information Intellect, and IP Holdings under the Security Agreement.

130.   Accordingly, RTWW, Bravera, Information Intellect, and IP Holdings are liable as guarantors for all of the amounts due and owing to Plaintiffs by RTWW.

**FIFTH COUNT**
**(Breach of the Registration Rights Agreement – Against RTWW)**

131.   Plaintiffs reallege every allegation contained in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, and 126 through 130, above.

132.   Plaintiffs have no obligations to RTWW under the RRA.

133.   By contrast, as set forth above, RTWW breached the Registration Rights Agreement by failing to file the initial registration statements in connection with the Issued Stock and Warrants within the 30th calendar day after July 13, 2007.

134.   As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

135.   In addition, pursuant to Section 6(a) of the RRA, Plaintiffs are entitled to an order of specific performance requiring RTWW to file the registration statements required by Section 2(a) of the RRA.

136.   Accordingly, RTWW is liable to Plaintiffs for breach of contract.

**SIXTH COUNT**
**(Breach of the Waiver Agreement – Against RTWW,**
**Bravera, Information Intellect, and IP Holdings)**

137.   Plaintiffs reallege every allegation contained in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, and 132 through 136, above.

26

138.    Plaintiffs fully performed all of their obligations to RTWW, Bravera, Information Intellect, and IP Holdings under the Waiver Agreement.

139.    By contrast, as set forth above, RTWW breached the Waiver Agreement by failing: (i) to make payments of $1.6 million to Plaintiff CAMOFI and $400,000 to Plaintiff CAMHZN on or before April 25, 2008, in violation of Section 4(a) thereof, and (ii) to pay to Plaintiffs all outstanding amounts under the Notes no later than June 30, 2008, by making certain specified payments to Plaintiffs on or before each of May 15, June 15, and June 30, 2008 in violation of Sections 4(c), (d) and (e) thereof, respectively.

140.    RTWW further breached the Waiver Agreement by failing to issue the required warrants to Plaintiffs for the purchase of shares of common stock of RTWW, in violation of Section 4(b) thereof.

141.    As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.  In addition, RTWW is obligated to pay interest, costs, and attorneys' fees in accordance with the terms of the Notes in an amount to be determined at trial.

142.    Accordingly, RTWW, Bravera, Information Intellect, and IP Holdings are liable to Plaintiffs for breach of contract.

## SEVENTH COUNT
### (Violation of Section 10(b) of the Securities Exchange Act of 1934, As Amended, and Rule 10b-5 Promulgated Thereunder – Against all Defendants)

143.    Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, and 138 through 142 above.

144.    Each of the Defendants knowingly and intentionally misrepresented and concealed from Plaintiffs material facts concerning the financial condition and prospects of

27

RTWW and the RTWW Subsidiaries, both in discussions prior to execution of the Transaction Documents and thereafter including, without limitation, in public filings with the SEC.

145.   As set forth above, those representations include, but are not limited to, the following:  (i) a February 19, 2008, e-mail from Defendant Connolly to Plaintiffs advising them that payment would be made after closing of a funding RTWW was seeking; (ii) an e-mail from Defendant Wilde on March 2, 2008, to Plaintiffs stating that RTWW was about to close a key transaction and that the "majority of the proceeds of the transaction will be paid to [Plaintiffs] in the next two days"; (iii) a March 31, 2008, follow-up e-mail from Defendant Wilde to Plaintiffs making the same representations of imminent closing of transactions with third-parties and subsequent payment to Plaintiffs of monies due and owing under the Notes; (iv) an August 20, 2008, e-mail from Defendant Vitetta to Plaintiffs stating that money would be available to pay Plaintiffs that week; and (v) a September 2, 2008, e-mail from Defendant Wilde representing that RTWW's bank "has confirmed" funds were sent to Matrix's Morgan Stanley account and that $8.5 million would be paid to Plaintiffs in the next two days.

146.   Misrepresentations from Defendants to Plaintiffs concerning alleged closings of transactions with third-parties and imminent payments to Plaintiffs continued in late 2008 including, for example, an October 21, 2008, e-mail from Defendant Wilde to Plaintiffs advising of "3 very strong opportunities completed" and an October 31, 2008, e-mail from Defendant Wilde to Plaintiffs advising of the closing of two new deals.

147.   The representations and omissions by Defendants set forth in this Complaint were false and were known to be false when made by Defendants and were made for the purpose of inducing Plaintiffs to rely on them.

148.   As set forth in the SPA and other Transaction Documents, such representations and omissions were made in connection with the sale of securities by Defendant RTWW to

28

Plaintiffs and, in so doing, Defendants employed the means and instrumentalities of interstate commerce and communication.

149. Plaintiffs reasonably relied on the representations and omissions of Defendants in: (i) entering into the SPA and related Transaction Documents; (ii) making the Loan; (iii) entering into the Waiver Agreement; and (iv) delaying the exercise of their rights under such agreements to accelerate payments of the Notes and to foreclose on the Collateral.

150. These false misrepresentations by Defendants are in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, which prohibits any person from "directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

151. As a result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other and further relief as is just and proper including an award of the costs and disbursements of this action.

152. In addition, Defendants' conduct as alleged herein was wanton, willful and malicious, and Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial.

389629

**EIGHTH COUNT**
**(Violation of Section 20(a) of the Exchange Act – Against**
**Defendants Wilde, Wheeler, Vitetta, and Connelly)**

153.    Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, and 144 through 152 above.

154.    As set forth in detail above, and specifically in paragraphs 59 through 63, 66 through 92, and 144 through 147, each of Defendants Wilde, Wheeler, Vitetta, and Connelly knowingly and intentionally misrepresented and concealed from Plaintiffs material facts concerning the financial condition and prospects of RTWW and the RTWW Subsidiaries, both in discussions prior to execution of the Transaction Documents and thereafter and in public filings with the SEC.

155.    By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of RTWW and the RTWW Subsidiaries' operations, Defendants Wilde, Wheeler, Vitetta and Connelly had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Defendants RTWW and the RTWW Subsidiaries including the content and dissemination of the various statements which Plaintiffs allege herein are false and misleading.

156.    Defendants Wilde, Wheeler, Vitetta, and Connelly acted as controlling persons of Defendants RTWW and the RTWW Subsidiaries within the meaning of Section 20(a) of the Exchange Act as set forth above.

157.    As set forth above, Defendants Wilde, Wheeler, Vitetta, and Connelly each violated Section 20(a) of the Exchange Act by misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, they are liable pursuant to Section 20(a) of the Exchange Act.

30

158.    As a result of Defendants' Wilde, Wheeler, Vitetta, and Connelly's violation of Section 20(a) of the Exchange Act, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other and further relief as is just and proper including an award of the costs and disbursements of this action.

159.    In addition, Defendants' conduct as alleged herein was wanton, willful and malicious, and Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial.

## NINTH COUNT
### (Common Law Fraud – Against All Defendants)

160.    Plaintiffs reallege every allegation in 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, 144 through 152, and 154 through 159, above.

161.    As set forth in detail above, and specifically, in paragraphs 59 through 63, 66 through 92, and 145 through 147 above, each of the Defendants knowingly and intentionally misrepresented and concealed from Plaintiffs material facts concerning the financial condition and prospects of RTWW and the RTWW Subsidiaries at all relevant times, both in discussions prior to execution of the Transaction Documents and thereafter and in public filings with the SEC.

162.    Such misrepresentations included, among other things, representing in the SPA that the "fair saleable value of [the assets of RTWW and the RTWW Subsidiaries, as a whole] exceeds the amount that will be required to be paid on or in respect of [their] existing debts and other liabilities (including known contingent liabilities) as they mature."

31

389629

163.    As set forth above, this representation was false because Defendants knew or should have known that the value of the assets of RTWW and the RTWW Subsidiaries -- i.e., the value of the Collateral -- on the date of execution of the SPA was far less than $7.25 million, the amount of the Loan.

164.    Defendants also misrepresented and/or failed to disclose to Plaintiffs that certain "guaranteed" contracts entered into between the RTWW Subsidiaries and third parties for the purchase of the RTWW Subsidiaries' IT and BPM products did not represent a fixed and determinable stream of income that could secure payment under the Notes.

165.    As set forth above, another material misrepresentation made by Defendants to Plaintiffs concerned RTWW's commitment to cause Riptide Software to pay up to $830,000 of its outstanding tax liability as of the date of execution of the Transaction Documents, and to satisfy its obligations on the seller notes it issued to Riptide Software's former shareholders in connection with its acquisition of Riptide Software.

166.    RTWW payment of these seller notes would have allowed Riptide Software's former shareholders to reimburse Riptide Software for its payment to the IRS of up to $830,000 of the company's pre-existing liability at the time of its acquisition by RTWW. RTWW failed and refused to (a) cause Riptide Software to satisfy the percentage of its pre-existing tax liability it had committed to pay, as well as (b) make the required payments under the seller notes RTWW had issued, resulting in a substantial diminution of the value of both RTWW and Riptide Software.

167.    Plaintiffs reasonably relied on the representations of Defendants in (i) entering into the SPA and related Transaction Documents; (ii) making the Loan; (iii) entering into the Waiver Agreement; and (iv) delaying the exercise of their rights under such agreements to accelerate payments of the Notes and to foreclose on the Collateral.

32

389629

168.   As a result of Defendants' fraudulent misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other and further relief as is just and proper including an award of the costs and disbursements of this action.

169.   In addition, Defendants' conduct as alleged herein was wanton, willful and malicious, and Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial.

170.   Accordingly, Defendants are liable to Plaintiffs for fraud.

## TENTH COUNT
**(Fraudulent Conveyance Under New York Debtor and Creditor Law
Section 274 – Against Defendants RTWW, Bravera, Information Intellect,
IP Holdings, Wilde, Wheeler, Vitetta, and Connelly)**

171.   Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, 144 through 152, 154 through 159, and 161 through 170, above.

172.   As set forth above, Defendants made fraudulent transfers of funds to Defendants Wilde, Wheeler, Vitetta, and Connolly under the guise of bonuses and increased salaries (the "Transfers"), which Transfers served no legitimate purpose to RTWW or the RTWW Subsidiaries, but rather served only to benefit the individual Defendants themselves.

173.   At the time of the Transfers, Defendants knew that RTWW and the RTWW Subsidiaries were indebted to Plaintiffs for at least $13.5 million, as a result of RTWW's failure to make payments to Plaintiffs of principal and interest due under the Notes.

174.   The Transfers were made without fair consideration to RTWW or the RTWW Subsidiaries and left RTWW and the RTWW Subsidiaries with unreasonably small capital to continue their businesses.

33

389629

175.    Accordingly, the Transfers constitute fraudulent conveyances within the meaning of New York Debtor and Creditor Law Section 274.

176.    As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

177.    Accordingly, Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connolly are liable to Plaintiffs under New York Debtor and Creditor Law Section 274.

**ELEVENTH COUNT**
**(Fraudulent Conveyance Under New York Debtor and Creditor Law**
**Section 275 – Against Defendants RTWW, Bravera, Information Intellect,**
**IP Holdings, Wilde, Wheeler, Vitetta, and Connolly)**

178.    Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, 144 through 152, 154 through 159, 161 through 170, and 172 through 177, above.

179.    As set forth above, the Transfers made by Defendants to Wilde, Wheeler, Vitetta and Connolly served no legitimate purpose to RTWW or the RTWW Subsidiaries, but rather served only to benefit the individual Defendants themselves.

180.    At the time of the Transfers, Defendants knew that RTWW and the RTWW Subsidiaries were indebted to Plaintiffs for at least $19 million as a result of RTWW's failure to make payments to Plaintiffs of principal and interest due under the Notes.

181.    The Transfers were made without fair consideration to RTWW or the RTWW Subsidiaries and, at the time the Transfers were made, Defendants RTWW and the RTWW Subsidiaries were unable to pay their debts owing to Plaintiffs. Defendants also knew at the time of the Transfers that RTWW and the RTWW Subsidiaries were incurring additional debts to

34

Plaintiffs on a daily basis by reason of the continuing interest due and owing under the Notes, and the Obligations under the Subsidiary Guarantee.

182.    Accordingly, the Transfers constitute fraudulent conveyances within the meaning of New York Debtor and Creditor Law Section 275.

183.    As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

184.    Accordingly, Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connolly are liable to Plaintiffs under New York Debtor and Creditor Law Section 275.

### TWELFTH COUNT
**(Fraudulent Conveyance Under New York Debtor and Creditor Law Section 276 – Against Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta and Connolly)**

185.    Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, 144 through 152, 154 through 159, 161 through 170, 172 through 177, and 179 through 184, above.

186.    As set forth above, the Transfers made to Defendants Wilde, Wheeler, Vitetta, served no legitimate purpose to RTWW or the RTWW Subsidiaries, but rather served only to benefit the individual Defendants themselves.

187.    The Transfers were made by Defendants with actual intent to hinder, delay, or defraud Plaintiffs from recovering from RTWW and the RTWW Subsidiaries the principal, interests, and other costs and fees due to Plaintiffs as a result of RTWW's failure to make payments to Plaintiffs when due under the Notes.

188.    Accordingly, the Transfers constitute fraudulent conveyances within the meaning of New York Debtor and Creditor Law Section 276.

35

189.    As a result, Plaintiffs have been damaged in an amount to be determined at trial, but at least $19 million.

190.    Accordingly, Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connolly are liable to Plaintiffs under New York Debtor and Creditor Law Section 276.

**THIRTEENTH COUNT**
**(For a Preliminary and Permanent Injunction – Against all Defendants)**

191.    Plaintiffs reallege every allegation in paragraphs 1 through 106, 108 through 112, 114 through 118, 120 through 124, 126 through 130, 132 through 136, 138 through 142, 144 through 152, 154 through 159, 161 through 170, 172 through 177, 179 through 184, and 186 through 190 above.

192.    As set forth above, Defendants have fraudulently transferred assets that are part of the Collateral securing the Loan.  Given RTWW's admitted and undisputed default on its obligations under the Notes, there can be no dispute that Plaintiffs will at the very least succeed on the merits of their breach of contract claims in this litigation.

193.    The equities weigh in favor of protecting Plaintiffs' secured interest in the Collateral and rights under their various agreements with the Defendants.

194.    Plaintiffs have no adequate remedy at law.

195.    Accordingly, Plaintiffs are entitled to an order preliminarily and permanently enjoining Defendants from damaging, destroying, transferring, conveying, disposing of or further dissipating the value of the Collateral or the Collateral itself.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

36

389629

A.    On the First Count, for breach of contract under the SPA against Defendant RTWW, for compensatory and consequential damages in an amount to be determined at trial, but at least $19 million, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action;

B.    On the Second Count, for breach of the Notes against Defendant RTWW, for compensatory and consequential damages in an amount to be determined at trial, but at least $19 million, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action;

C.    On the Third Count, for breach of the Subsidiary Guarantee against Defendants Bravera, Information Intellect, and IP Holdings, jointly and severally, for compensatory and consequential damages in an amount to be determined at trial, but at least $19 million, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action;

D.    On the Fourth Count, for breach of the Security Agreement against Defendants RTWW, Bravera, Information Intellect, and IP Holdings, awarding Plaintiffs immediate possession of the Collateral, foreclosure and judgment under the Security Agreement, together with such other relief as is just and proper, including an award of the costs, legal fees and disbursements of this action;

E.    On the Fifth Count, for breach of the Registration Rights Agreement against RTWW: (i) for compensatory and consequential damages in an amount to be determined at trial, but at least $19 million; (ii) ordering that RTWW file the registration statements required by Section 2(a) of the RRA; and (iii) for such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action;

389629

F.     On the Sixth Count, for breach of the Waiver Agreement against RTWW, Bravera, Information Intellect, and IP Holdings, jointly and severally, for compensatory and consequential damages in an amount to be determined at trial, but at least $19 million, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action;

G.     On the Seventh Count, for violation of Section 10(b) and Rule 10b-5 of the Exchange Act against all Defendants, for damages in the amount of $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action, and an award of punitive damages in an amount to be determined at trial;

H.     On the Eighth Count, for violation of Section 20(a) of the Exchange Act against Defendants Wilde, Wheeler, Vitetta, and Connelly, for damages in the amount of at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action, and an award of punitive damages in an amount to be determined at trial;

I.     On the Ninth Count, for common law fraud against all Defendants, for damages in the amount of at least $19 million together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action, and an award of punitive damages in an amount to be determined at trial;

J.     On the Tenth Count, for fraudulent conveyance under New York Debtor and Creditor Law Section 274 against Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connelly, for damages in the amount of at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together

389629

with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action in an amount to be determined at trial;

     K.     On the Eleventh Count, for fraudulent conveyance under New York Debtor and Creditor Law Section 275 against Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connelly, for damages in the amount of at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action in an amount to be determined at trial;

     L.     On the Twelfth Count, for fraudulent conveyance under New York Debtor and Creditor Law Section 276 against Defendants RTWW, Bravera, Information Intellect, IP Holdings, Wilde, Wheeler, Vitetta, and Connelly, for damages in the amount of at least $19 million, together with continuing interest thereon at the Default Rate under the Notes, together with such other relief as is just and proper, including an award of the costs, legal fees, and the disbursements of this action in an amount to be determined at trial;

     M.     On the Thirteenth Count, ordering that all Defendants be preliminarily and permanently enjoined from damaging, destroying, transferring, conveying, disposing of or further dissipating the value of the Collateral or the Collateral itself; and

389629

N.    Awarding Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        May 14, 2010                         Respectfully submitted,

                                             SILLER WILK LLP


                                             By: _____
                                                 Jay S. Auslander (JA-5866)
                                                 Natalie Shkolnik (NS-0880)
                                             *Attorneys for Plaintiffs CAMOFI Master LDC and
                                             CAMHZN Master LDC*
                                             675 Third Avenue
                                             New York, New York 10017-5704
                                             (212) 421-2233

389629